**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIRANDA YEE,

    Plaintiff,

    v.

THE AIG LIFE COMPANIES (U.S.), et al.,

    Defendants.
_____/

No. C 03-5873 PJH

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND STAYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

On May 4, 2005, the court heard argument in the parties' cross-motions for summary judgment. Plaintiff appeared by her counsel Gener D. Benitez, and defendants appeared by their counsel Charan M. Higbee. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby DENIES defendants' motion and GRANTS plaintiff's motion in part and STAYS it in part, for the following reasons and as stated at the hearing.

## INTRODUCTION

This is case brought under the Employment Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA"), challenging denial of long-term disability benefits. Plaintiff Miranda Yee resides in San Francisco, California. She was employed by defendant American

International Group, Inc. ("AIG, Inc.") as a "service specialist" from approximately December 2000 to January 2002. Her duties included assembling and issuing insurance policies, renewals, and midterm endorsements based on underwriter instructions.

Plaintiff was insured under the AIG, Inc., Long Term Disability Plan ("the Plan"). The policy was issued by AI Life Assurance Company of New York ("AI Life Assurance" – a member of defendant The AIG Life Companies (U.S.) ("AIG Life Companies")). The Plan states that AIG, Inc., is the Plan Administrator, which "retains full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend, or modify the Plan, in whole or in part, at any time, without prior notice." The Plan also states that AI Life Assurance has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the policy.

The Plan provides total disability benefits for any AIG, Inc., employee who is disabled from performing one or more of the essential duties of his or her "own occupation" during the first 24 months of disability. After the first 24 months of disability, the definition of "total disability" changes to an "any occupation" standard, and has a maximum benefit period extending to the employee's 65th birthday. If the disability is based on mental illness as defined in the Plan, the payment of benefits is limited to a period of 24 months.

The Plan also provides for an "elimination period," which is the period of time the employee must be disabled before benefits become payable. This period of time is either the first 180 days of any one period of disability, or, with the exception of benefits required by state law, the expiration of any employer-sponsored short-term disability benefits or salary continuation program.

Plaintiff was on work probation from October 2001 to February 2002. She took a leave of absence starting January 2002, and received short-term disability benefits until mid-July 2002. She filed a claim for long-term disability benefits in June 2002, asserting that she was disabled from performing her occupation with AIG because of mental stress and depression. The parties do not dispute that plaintiff's alleged mental stress and depression constitute "mental illness" under the Plan. Thus, plaintiff's claim is limited to a two-year maximum

benefit.

AIG Life Companies denied the claim in October 2002, and denied plaintiff's appeal of the denial in January 2003. Plaintiff filed this action on December 31, 2003.[1] Defendants are AIG, the AIG Long Term Disability Plan, and AIG Life Companies as administrator and fiduciary of the Plan (collectively, "AIG").

Each side now seeks summary judgment. The parties agree that the appropriate standard of review is abuse of discretion.

## BACKGROUND

Plaintiff claims that beginning in April 2001, her supervisor harassed and repeatedly yelled her at in front of other people. She asserts that as a result of this harassment and humiliation, she suffered emotional distress, anxiety, and nervousness, along with numerous physical symptoms, and that she eventually had to leave her job on January 10, 2002.

On January 15, 2002, plaintiff sought medical treatment at Kaiser Permanente Medical Center. She was diagnosed with Major Depressive Disorder, was prescribed medication, and was referred to group therapy and for further medical evaluation. On January 22, 2002, plaintiff was diagnosed with Major Depression, Single Episode, and was prescribed medication for depression, anxiety, and insomnia. The dosage of the antidepressants was subsequently increased, and plaintiff continued with the group therapy.

On January 25, 2002, Brad Crowell, M.D., a Kaiser physician, wrote that plaintiff was unable to perform her occupation as of January 15, 2002, due to Major Depressive Disorder, single episode. He stated that plaintiff reported an increase in depressed mood and irritation, and a decrease in ability to concentrate. He indicated that he expected plaintiff to be able to

---

[1] Plaintiff's claim file is attached as Exh. A to the Declaration of George Ashmore in support of defendants' motion (docket No. 21), filed March 25, 2005. In reviewing the file, the court discovered that plaintiff's social security number appears on more than 20 different pages of the claim file. Civil Local Rule 3-17 provides that personal data identifiers, such as social security numbers, not be included in publicly-filed pleadings and other papers. "If an individual's social security number must be included in a pleading or other paper filed in the public file, only the last four digits of that number should be used." Civ. L.R. 3-17(a)(1). Accordingly, by separate order, the court directs that the Ashmore Declaration be removed from the electronic case file, and that defendants re-file the declaration, with plaintiff's social security number redacted.

return to work in February 2002.

On January 30, 2002, plaintiff reported to Wai Chung, LCSW, a Kaiser therapist, that she was leaning towards leaving AIG, Inc., "because of the unsupportive work environment." Ms. Chung wrote that plaintiff would be able to return to work on February 13, 2002. She extended plaintiff's disability to February 17, 2002, to give her time to respond to the prescribed medication.

On February 13, Martin J. Driscoll, Ph.D., also of Kaiser, wrote that plaintiff "continues to feel very depressed and anxious, which affect her ability to concentrate at work." He estimated that plaintiff would be able to return to work within three to six weeks.

On February 13, 2002, Ms. Chung wrote that plaintiff would be able to return to work on March 11, 2002.

On March 6, 2002, Ms. Chung wrote that plaintiff would be able to return to work on March 25, 2002.

On March 8, 2002, Dr. Crowell wrote that plaintiff "still experiences depressed mood, lack of concentration, and sleep disturbance." He anticipated that she would be able to return to work within two to three weeks.

On March 13, 2002, Ms. Chung wrote that plaintiff would be able to return to work on April 15, 2002.

On March 20, 2002, Dr. Crowell reported that plaintiff was doing well, that she was able to sleep, and that she was actively looking for a job.

On April 2, 2002, Dr. Crowell wrote that plaintiff "continues to experience depressed mood and anxiety which impact her ability to concentrate at work." He estimated that plaintiff would be able to return to work in three to six weeks.

On April 3, 2002, Ms. Chung wrote that plaintiff "tends to still be worried about finding a job." Ms. Chung encouraged plaintiff to give herself more options in terms of not limiting her job search to the insurance and accounting fields. She noted that plaintiff would no longer be "on urgent apt."

On April 17, 2002, Dr. Crowell wrote that plaintiff had seen her supervisor in the clinic a

4

couple of weeks earlier, and so had not since attended the weekly group therapy. He told her she needed to attend the group.

On April 18, 2002, Ms. Chung held a family session with plaintiff and her sister and cousin. According to Ms. Chung, plaintiff's family members were frustrated by plaintiff's slow progress, and felt defensive about the fact that plaintiff was not being seen intensively (once a week). Ms. Chung states that she "clarified our department treatment modalities and its short-term nature." She explained to plaintiff's family members that plaintiff had to be "willing to change her behavior, i.e., to get temporary job, to pay for own health benefit." She explained further that plaintiff's disability was "based on inability to work" and "not being flexible to explore job options is not a criteria and is detrimental to her improvement." In addition, she advised plaintiff that the period of short-term disability would be extended only up to May 17, 2002.

On April 24, 2002, at the request of AIG, plaintiff was evaluated by an Independent Medical Examiner ("IME"), Dr. Demetrius Karalis. Dr. Karalis reported that plaintiff appeared "quite anxious, and seriously depressed," and that testing showed that she suffered from "severe anxiety" and "serious out-patient levels of depression, bordering on that seen in hospitalized psychiatric patients." He stated that plaintiff suffered from "Major Depression," and that he did not believe she was able to engage in any job at that time, or that she would be able to return to work before August 15, 2002. He indicated, however, that "[t]he prognosis is good," and that plaintiff was "likely to return to work," but added that "a reasonable resolution of her mental condition [would] not occur prior to August 15, 2002.

On May 1, 2002, Dr. Crowell wrote that plaintiff "continues to experience some depressed mood which impact her ability of concentration at work." He estimated that she would be able to return to work within two to three weeks.

Also on May 1, 2002, Ms. Chung wrote that plaintiff "feels anxious about resigning from her present job, still feels very angry at not being treated fairly on the job." Ms. Chung encouraged plaintiff to "file a grievance with the H.R. as well as actively looking for jobs." She noted that plaintiff's treatment was being transferred to Daniel Geer, LCSW, another Kaiser

therapist.

On May 8, 2002, Mr. Geer noted that plaintiff had been transferred from the Crisis Team, and stated that plaintiff seemed to alter between feeling angry with her employer and supervisors and feeling guilty/ashamed. He noted that while she felt that filing a grievance would be unacceptable, she nonetheless agreed to do so in order to direct her anger and regain her self-confidence.

On May 15, 2002, plaintiff asked Mr. Geer for an extension of the short-term disability cut-off date. Mr. Geer wrote that he "set a limit" and told plaintiff that "she needs to take action on moving forward with goals." He noted that plaintiff was still feeling ambivalent about the grievance.

Plaintiff was apparently not happy with the treatment she was receiving at Kaiser, and had requested that she be allowed to see Dr. Karalis for individual therapy. AIG approved the request. Dr. Karalis began treating plaintiff on May 23, 2002, when he also wrote that he believed plaintiff should be able to return to work on August 15, 2002.

Plaintiff applied for long-term disability with AIG on June 4, 2002. In the application, she stated she had stopped working because of "mental stress from harassment." She also stated that she had experienced "extreme emotional distress from harassment which caused [her] to seek physician M.D. and psychiatric therapy." She claimed she could not work at AIG, Inc., because of conflicts with other AIG personnel.

Also on June 4, 2002, Dr. Karalis signed a statement as plaintiff's attending physician, in support of her application for long-term disability. He stated that plaintiff had been unable to perform her occupation since January 11, 2002, due to Major Depression. He also indicated that plaintiff had a major psychiatric impairment in several areas – work, family relations.

On June 5, 2002, plaintiff reported to Mr. Geer that she had "sent out a few resumes." She also indicated that she had "taken steps" toward filing a grievance with the EEOC. She had not resigned from her job, and was concerned about the cost of COBRA insurance. Mr. Geer encouraged plaintiff to proceed with the grievance and job search, and to take breaks from caregiving for mother who was disabled from stroke.

After receiving plaintiff's application for long-term disability benefits on June 10, 2002, AIG began investigating plaintiff's claim.

On June 13, 2002, Dr. Crowell wrote that plaintiff reported she felt she was doing well when the stress was low, but that she remained vulnerable when stress increased. Her mood was also affected by the fog, and Dr. Crowell suggested she go to a sunny area of the City at least three times a week. She reported that she did not feel ready to return to work, that she had applied for a couple of jobs, but was not actively looking because she felt vulnerable. She mentioned the stress of caring for her elderly parents in the evenings, on top of working during the day. She was planning a trip to Arizona to visit a cousin the following week, and seemed anxious about flying.

As part of its investigation, AIG sought to determine plaintiff's level of functionality as of January 11, 2002, and through the 180-day elimination period and beyond. For this reason, AIG requested that Lori Cohen, Ph.D, a licensed psychologist, conduct a medical records review. In addition to reviewing the records, Dr. Cohen also discussed plaintiff's case with her health care providers.

On July 19, 2002, Dr. Cohen spoke with Mr. Geer at Kaiser. Mr. Geer stated that he had become plaintiff's therapist on May 8, 2002, after she had transferred from Ms. Chung. He indicated that Dr. Crowell and Ms. Chung had come to the conclusion that plaintiff could work as of mid-May 2002. Mr. Geer then saw plaintiff on May 15, 2002, on June 5, 2002, and on July 10, 2002. His opinion was that although it would not be "healthy" for plaintiff to return to work for AIG because of the alleged verbal abuse by her supervisor, she nevertheless "could probably do some job" for a different employer. He indicated that plaintiff was "cognitively intact" and got to appointments on time. He was unaware that plaintiff had filed a claim for disability benefits, and believed that plaintiff was trying to get back to work, noting that she had stated she was sending out resumes. He was also unaware that plaintiff was seeing a psychiatrist outside of the Kaiser system.

On July 22, 2002, Dr. Cohen spoke with Dr. Karalis. Dr. Karalis stated that he had seen plaintiff on April 24, 2002, on May 23, 2002, on June 4, 2002, and on July 19, 2002. He

did not know that she was also being actively treated at Kaiser during this time. Dr. Keralis was also unaware that plaintiff had sent out resumes, stating that she "had not gotten to the point where she was looking for work." His opinion was that plaintiff was impaired from performing her job at AIG, and was not able to perform a job search for other employment at that time. However, he also stated that if plaintiff were "offered a job now for a different employer, she might be able to perform," and that he "would support a return to work if she had a job to return to." He agreed that plaintiff had no cognitive deficits, and that if a job were available for plaintiff she could return to work.

On July 31, 2002, Dr. Cohen prepared a report, noting that the available data regarding plaintiff's psychiatric status and functional capacity was inconsistent. She also noted that Dr. Crowell's chart entries reflected plaintiff's gradual improvement, a job search, and her readiness to begin work in mid-May 2002. Although Dr. Cohen had attempted to reach Dr. Crowell by telephone, she stated that he had not returned her phone calls.

On October 4, 2002, Dr. Cohen wrote a follow-up memorandum, explaining the additional efforts she had made to discuss the matter with Dr. Crowell to clarify the apparent inconsistencies between Dr. Crowell's reports of plaintiff's capacity for functioning occupationally, and Dr. Karalis' opinions regarding plaintiff's psychiatric status. She stated that Dr. Crowell had left a voice message indicating he could not recall the details of plaintiff's treatment without consulting the chart, and that he had nothing further to offer regarding plaintiff's psychiatric status and functionality other than what was stated in his reports. Dr. Cohen concluded that "it appears that the data remains inconsistent with some specific discrepancies regarding [plaintiff's] psychiatric symptoms and readiness to resume work."

On October 10, 2002, AIG denied plaintiff's long-term disability claim, stating that her current limitations were not medically supported throughout the "Elimination Period." The letter stated that AIG had viewed all the papers in plaintiff's medical file "as a whole," including the initial claim forms, office records from Dr. Crowell, records of telephone conversations with Mr. Greer and Dr. Karalis, and voice-mail message from Dr. Crowell, and review by AIG's medical staff. The letter cited a few individual facts from the file.

On December 16, 2002, AIG received an appeal letter from plaintiff. Plaintiff stated that she was continuously under tremendous emotional stress and depression, and had a total loss of self-esteem. She blamed her condition on the actions of her supervisors at AIG, asserting that she had been harassed and treated unfairly, and that her self-respect and dignity as a human being had been taken away. She stated that she had recurring nightmares of the harassment she endured at AIG, and that she also suffered from insomnia, headaches, nausea, and panic attacks. She claimed to have lost her ability to focus and concentrate, and asserted that she need to be under continuous psychiatric therapy and medical treatment in order to overcome the depression and anxiety. She stated that she was currently under the care of Dr. Karalis and Dr. Crowell, and was taking Prozac, Trazedone, and Neurontin. She claimed that the Prozac had caused side effects, including headaches, nausea, nervousness, anxiety, panic attacks, inability to think, and worsening depression.

On January 3, 2003, AIG informed plaintiff that a comprehensive review of her file had been completed, and that the medical information did not demonstrate that she was eligible for benefits, and that the initial claims determination was therefore upheld. The letter summarized the medical information that AIG had relied upon to reach the determination, and stated that the evidence did not support a finding that plaintiff was "totally disabled" from performing her own occupation in the national economy, noting that while plaintiff might have difficulty performing her own occupation for her employer (AIG), the medical file did not support a finding that she could not perform her own occupation anywhere in the national economy during the elimination period.

**DISCUSSION**

A.  Legal Standard

Under ERISA's civil enforcement provision, a "participant or beneficiary" in an ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). A denial of ERISA benefits is reviewed de novo unless "the benefit plan gives the administrator or fiduciary discretionary authority to

1  determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber
2  Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the benefit plan confers discretion on the plan
3  administrator or fiduciary to determine eligibility for benefits or to construe the plan's terms, a
4  district court normally reviews the determination for abuse of discretion.  Alford v. DCH Found.
5  Group Long-Term Disability Plan, 311 F.3d 955, 957 (9th Cir. 2002); Bendixen v. Standard
6  Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999).

7  The question whether the administrator or fiduciary abused its discretion in denying
8  disability benefits is a question of law.  In such a case, a motion for summary judgment
9  functions as a "conduit to bring the legal question before the district court." Bendixen, 185
10 F.3d at 942.  Accordingly, "the usual tests of summary judgment, such as whether a genuine
11 dispute of material fact exists, do not apply."  Id.  When reviewing an administrator's decision
12 for abuse of discretion, the district court must consider only the evidence that was before the
13 plan administrator when the decision was made.  Alford, 311 F.3d at 959; McKenzie v. Gen.
14 Tel. Co., 41 F.3d 1310, 1316 (9th Cir.1994).

15 The decision of an administrator or fiduciary will not be disturbed unless the court
16 determines that the decision was arbitrary or capricious.  McKenzie, 41 F.3d at 1316.  "The
17 touchstone of 'arbitrary and capricious' conduct is unreasonableness."  Clark v. Washington
18 Teamsters Welfare Trust, 8 F.3d 1429, 1432 (9th Cir. 1993).  For example, it is an abuse of
19 discretion for ERISA plan administrators to render decisions without any explanation, or to
20 construe provisions of the plan in a way that conflicts with the plain language of the plan.  Eley
21 v. Boeing Co., 945 F.2d 276, 279 (9th Cir. 1991).  A decision that is not supported by
22 substantial evidence in the record constitutes an abuse of discretion.  McKenzie, 41 F.3d at
23 1316.  "[A]n administrator also abuses its discretion if it relies on clearly erroneous findings of
24 fact in making benefit determinations."  Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469,
25 1473 (9th Cir. 1993).

26 B.    The Parties' Cross-Motions

27 Plaintiff argues that AIG abused its discretion in denying her claim.  She  contends that
28 AIG manipulated the evidence and selectively chose evidence to support its position, that it

mischaracterized evidence, that it provided arbitrary and capricious reasons for denying the claim, and that it based its decision on insufficiently developed facts. Plaintiff lists six ways in which she claims AIG acted arbitrarily and capriciously.

She asserts that AIG did not give any consideration to her medication and its effects; that AIG manipulated and mischaracterized Ms. Chung's notes; that AIG manipulated and mischaracterized Mr. Geer's statement that plaintiff "could probably do some job;" that AIG manipulated and mischaracterized Dr. Karalis' statement that plaintiff could resume work if a job were available from a different employer; that AIG failed to review Dr. Crowell's notes to resolve the discrepancies between the opinion of Kaiser therapists that plaintiff could work by mid-May 2002, and Dr. Karalis' opinion that plaintiff would not be ready to work until at least August 2002; and that AIG's denial-of-appeal letter capriciously disregarded Dr. Karalis' opinion regarding the onset of her illness.

Plaintiff argues in addition that the evidence shows that she was unable to work through the elimination period. She states that she gave AIG medical certifications and attending physician's supplementary statements (referring to Ms. Chung's certifications of January 30, 2002, February 13, 2002, March 6, 2002, March 13, 2002, and April 18, 2002; to Dr. Karalis' supplementary statement of May 23, 2002; to Dr. Crowell's supplementary statements of March 8, 2002, April 2, 2002, and May 1, 2002; and to Dr. Driscoll's supplementary statement of February 13, 2002) that support her inability to work throughout the elimination period. In particular, she notes that Dr. Karalis' supplementary statement of May 23, 2002, states that she will be unable to work until August 15, 2002, which is past the Elimination Period (July 18, 2002).

Finally, plaintiff asserts that because the administrative record does not state when her unemployment benefits stopped or whether she received Social Security benefits, her long-term benefits under the Plan cannot be determined. Her solution is for the court to remand the matter to the Administrator and order the Administrator to pay her 24 months of long-term disability, the maximum allowable under the Plan.

She also claims that she is entitled to attorneys' fees because AIG acted in bad faith in

manipulating and mischaracterizing the evidence, in ignoring evidence favorable to her position (especially evidence regarding her medications and psychiatrists' notes), in making its determination based on insufficient facts, and in presenting arbitrary and capricious reasons for its decision.

AIG contends that the decision to deny plaintiff's claim was reasonable and supported by substantial evidence, that plaintiff's contention that AIG abused its discretion is unfounded and improperly seeks to substitute the opinion of plaintiff or the court for the decision of the Administrator, and that plaintiff is not entitled to attorneys' fees.

AIG asserts that it began a claim investigation after receiving plaintiff's claim for long-term disability benefits. AIG maintains that the information it obtained and reviewed established discrepancies among the medical providers as to whether plaintiff could perform the essential duties of her occupation during the elimination period. AIG argues that where, as here, an administrative record reflects no clear, single conclusion as to a claimant's disability status because some portions of the record are contradicted by other medical opinions in the record, a plaint administrator's siding with some treating physicians' opinions over others is not an abuse of discretion.

The court finds that AIG did not base its determination on substantial evidence and did not support its decision with adequate reasons. The decision was arbitrary and capricious because AIG failed to give ordinary meaning to the Plan terms. The court finds no indication in any of the medical records – which are records of treating medical providers only – that any physician or other health provider evaluated plaintiff and made an actual determination that she was capable of performing the usual duties of her occupation in the national economy during the elimination period, or, if not, whether she remained disabled from performing the usual duties of her occupation during the remaining 18 months of the 24-month period. Rather, the records focus only on when plaintiff might "return to work" – a shifting target – and on whether plaintiff could do "some job" (something outside her usual occupation, something temporary) or could perhaps work if only she didn't have to actually look for a job.

Dr. Karalis initially stated that plaintiff could not return to work at all before mid-August

12

2002 – a date past the 180-day elimination period – but later said that maybe she could work if she only had a job. According to Mr. Geer, Ms. Chung and Dr. Crowell at some point both indicated that plaintiff could return to work mid-May 2002. Dr. Crowell's notes indicate that he wrote on May 1, 2002, that plaintiff could return to work within 2-3 weeks, but he had essentially been writing that every time he saw plaintiff since she first sought treatment. His notes after May 1, 2002, do not mention a particular return-to-work date. Similarly, Ms. Chung's notes indicate that each time she met with plaintiff, she believed plaintiff could return to work a few weeks down the road from that day, but the last time she saw plaintiff was May 1, 2002. Mr. Geer kept trying to get plaintiff to "file a grievance" and to express her anger. He does not say anything specific about plaintiff returning to work at any particular time. He felt it would not be "healthy" for plaintiff to return to her previous job, but thought she "could probably do some job."

Plaintiff's claim file contains no indication as to what the usual duties of plaintiff's occupation are, and no suggestion that any of the providers had that information at the time they made their evaluations and recommendations. Further, the court sees no indication in AIG's decision that AIG considered the impact of plaintiff's psychiatric condition on her ability to perform the usual duties of her occupation, despite AIG's conclusory statement that the evidence in the file did not support a finding that plaintiff was "totally disabled" from performing her own occupation in the national economy. Indeed, in denying benefits, AIG seems to have completely disregarded the fact that the long-term disability policy provided under the Plan was an "own-occupation" policy. Thus, AIG failed to make a full and fair review of plaintiff's claim.

**CONCLUSION**

In accordance with the foregoing, and for the reasons stated at the hearing, the court DENIES defendants' motion for summary judgment. The court GRANTS plaintiff's motion insofar as she seeks a determination that the denial of benefits was not based on substantial evidence. However, because the record is unclear whether plaintiff was eligible for benefits and, if so, for what period of time, the case is REMANDED for further development of the

record. The court STAYS the motion with regard to plaintiff's claim of entitlement to benefits, pending further development of the record.[2]

At a minimum, on remand, AIG must give plaintiff's medical providers a description of the essential duties of plaintiff's occupation, and must obtain opinions regarding the impact of plaintiff's psychiatric disability on her ability to perform those duties, and must then render a new decision based on that information and the other information in the record.

No later than July 6, 2005, the parties shall submit a joint statement, providing the court with an updated status report and stating whether they have settled the case, or whether they wish to submit further briefing. If the parties wish further briefing, they shall also provide a proposed schedule for plaintiff's opening brief, AIG's opposition, and plaintiff's reply.

**IT IS SO ORDERED.**

Dated: May 13, 2005

PHYLLIS J. HAMILTON
United States District Judge

---

[2] In light of this determination with regard to plaintiff's motion, the court makes no ruling on plaintiff's request for attorney's fees.

14